**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
                                                                :
**WADELL SMITH,**
                                                                :
                              **Petitioner,**
                                                                :
                       - against -
                                                                :
**D. LACLAIR, Superintendent, Upstate**
**Correctional Facility,**                        :
                                                                :
                              **Respondent.**        :
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/5/08

**OPINION AND ORDER**

**04 Civ. 4356 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Wadell Smith ("petitioner" or "defendant") brings a pro se habeas

petition under Title 28, United States Code, section 2254 ("section 2254")

challenging his state-court conviction for robbery and criminal possession of a

weapon charges.[1] Smith's petition was referred to Magistrate Judge Frank Maas

who issued a Report and Recommendation ("R&R" or the "Report"). Judge Maas

recommended that the petition be denied in its entirety, without a certificate of

appealability. Petitioner filed Objections to the Report shortly thereafter. On

March 17, 2008, this Court issued a Memorandum Opinion and Order (the

---

[1]    Smith was sentenced as a persistent violent felony offender to concurrent
prison terms amounting to twenty-two years to life imprisonment.

"Order"), familiarity with which is assumed, dismissing all but one of Smith's Objections.[2]

Thus, the only remaining issue is whether petitioner's right to a speedy trial under the Sixth Amendment was violated. If so, the state-court decision denying Smith's speedy trial claim represents an unreasonable application of federal law.[3] At the time of the Order, there was insufficient evidence to rule on petitioner's speedy trial claim.[4] Therefore, an evidentiary hearing was held on April 30 and May 20, 2008, in which Smith was represented by counsel. The findings and conclusions from that hearing follow.

## II. LEGAL STANDARDS

### A. Sixth Amendment Speedy Trial Claim

The right to a speedy trial is a fundamental right guaranteed by the

---

[2] *See Smith v. LaClair*, No. 04 Civ. 4356, 2008 WL 728653, at *4 (S.D.N.Y. Mar. 17, 2008) (The only issue raised in petitioner's Objections that has potential merit is whether petitioner's speedy trial rights under the Sixth Amendment have been violated.").

[3] *See People v. Smith*, 755 N.Y.S.2d 600 (1st Dep't 2003) (rejecting claims raised by Smith in his pro se supplemental appellate brief, including his Sixth Amendment Speedy Trial claim).

[4] *See Smith*, 2008 WL 728653, at *4 ("In short, this Court is unclear as to the actual number of days chargeable to the People, or the reasons proffered by the People for which it was responsible. Therefore, at this time, the Court cannot adequately analyze the first and second *Barker* factors.").

2

Sixth Amendment to the United States Constitution, imposed on the States

through the Due Process Clause of the Fourteenth Amendment.[5] Where there is a

Sixth Amendment violation, the appropriate remedy is dismissal of the

Indictment.[6] Because the Sixth Amendment speedy trial right cannot be quantified

into a specific number of days or months, speedy trial cases must be approached

on an ad hoc basis.[7] Courts should employ a balancing test incorporating the

following four factors: "[l]ength of delay, the reason for the delay, the defendant's

assertion of his right, and prejudice to the defendant."[8] With regard to these

factors, the Supreme Court has stated:

> We regard none of the four factors identified above as
> either a necessary or sufficient condition to the finding of
> a deprivation of the right of speedy trial. Rather, they are
> related factors and must be considered together with such
> other circumstances as may be relevant. In sum, these
> factors have no talismanic qualities; courts must still
> engage in a difficult and sensitive balancing process.[9]

Finally, in analyzing prejudice – the fourth *Barker* factor – courts should consider

---

[5] *See Barker v. Wingo*, 407 U.S. 514, 515 & n.2 (1972).

[6] *See id.* at 522.

[7] *See id.* at 523.

[8] *Id.* at 530.

[9] *Id.* at 533.

3

the following concerns: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."[10]

## B. Section 2254 Standard

Smith's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA provides that a federal court can grant a writ of habeas corpus to a state prisoner only if the state court's denial of relief "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[11] As explained by the Supreme Court, a state-court decision is "contrary to" clearly established federal law in the following instances:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.[12]

---

[10]  *Id.* at 532 (finding the last right to be the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system").

[11]  28 U.S.C. § 2254(d)(1).

[12]  *Williams v. Taylor,*  529 U.S. 362, 405 (2000).

4

With regard to the "unreasonable application" prong, the Supreme Court has stated

that

> a state-court decision can involve an "unreasonable
> application" of this Court's clearly established precedent in
> two ways. First, a state-court decision involves an
> unreasonable application of this Court's precedent if the
> state court identifies the correct governing legal rule from
> this Court's cases but unreasonably applies it to the facts of
> the particular state prisoner's case. Second, a state-court
> decision also involves an unreasonable application of this
> Court's precedent if the state court either unreasonably
> extends a legal principle from our precedent to a new
> context where it should not apply or unreasonably refuses
> to extend that principle to a new context where it should
> apply.[13]

In order for a federal court to find a state court's application of

Supreme Court precedent to be unreasonable, the state court's decision must have

been more than incorrect or erroneous: "[t]he state court's application of clearly

established law must be objectively unreasonable."[14] This standard "'falls

somewhere between merely erroneous and unreasonable to all reasonable

jurists.'"[15] While the test requires "'[s]ome increment of incorrectness beyond

---

[13] *Id.* at 407.

[14] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). *Accord Williams*, 529 U.S. at 409; *Harris v. Kuhlman*, 346 F.3d 330, 344 (2d Cir. 2003).

[15] *Overton v. Newton*, 295 F.3d 270, 276 (2d Cir. 2002) (quoting *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000)).

5

error, . . . the increment need not be great; otherwise *habeas* relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'"[16] Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."[17]

## III. DISCUSSION

### A. Length and Reasons for the Delay

Following the hearing, the parties were directed to submit charts analyzing the time intervals, and the reasons for adjournments, between petitioner's arraignment and the commencement of his criminal trial.[18] This analysis was undertaken to give the Court a firmer grasp over the amount of time in petitioner's criminal case: (1) chargeable to the People of the State of New

---

[16] *Id.* (quoting *Francis v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (emphasis in original)).

[17] *Williams*, 529 U.S. at 411.

[18] Respondent submitted his chart in a letter dated June 23, 2008, from Assistant Attorney General Leilani Rodriguez ("6/23/08 Ltr."). *See* 6/23/08 Ltr., Constitutional Speedy Trial Time Chart ("Respondent's Time Chart"). Petitioner submitted his chart as part of his Memorandum of Law in Further Support of Petitioner's Application for a Writ of Habeas Corpus, dated June 23, 2008 ("Pet. Mem.") at 18-20.

York; (2) not chargeable to either party (for example, adjournments due to motion practice and court congestion); and (3) chargeable to petitioner/defendant. This analysis permits this Court to properly consider the first two *Barker* factors – the length and reason for delay between indictment and trial.

In its brief submitted in connection with petitioner's appeal of his criminal conviction, the respondent, the People of the State of New York (the "People"), conceded that the total time chargeable to the People was 159 days.[19] In the instant matter, respondent now concedes that 111 days are chargeable to the People.[20] Smith's Chart, on the other hand, starts with the 159 days previously conceded by the People, to which an additional 298 days is added, resulting in a total of 457 days he argues are chargeable to the People.[21]

---

[19] *See* Brief for Respondent, Ex. C to the 12/30/04 Declaration of Danielle L. Attias, Assistant Attorney General, in Opposition to Petition for a Writ of Habeas Corpus, at 51 ("Accordingly, the total time chargeable to the People increased to 159 days.").

[20] *See* Respondent's Time Chart, summary page. Of the total 733 days, respondent argues that 111 days are chargeable to the People, 275 days are chargeable to petitioner, 320 days are attributable to motion practice, 20 days are attributable to court congestion, and 7 days are not accountable because they relate to Smith's co-defendant only.

[21] *See* Pet. Mem. at 20.

The period from August 2, 1998 to August 27, 1998 represents the

time from petitioner's arrest to the time of arraignment. Both parties agree that

this twenty-five day period is chargeable to the People. The next period, August

27, 1998 to September 18, 1998, is not chargeable (motion practice) as defendant

filed a motion pursuant to New York Criminal Procedure Law ("CPL") section

190.50, which was dated August 28, 1998 and returnable September 18, 1998.[22]

The People did not respond to defendant's section 190.50 motion until October 30,

1998, which was after the court-ordered deadline of September 30, 1998.[23] Thus,

the forty-two days between September 18, 1998 and October 30, 1998 is

chargeable to the People. The case was calendered for decision on October 30,

1998.[24] The case was adjourned until December 18, 1998, at which time the court

was to issue its decision on defendant's section 190.50 motion.[25] The court's

decision was delayed because of the People's failure to timely respond to

defendant's section 190.50 motion. Accordingly, the forty-nine day period from

October 30, 1998 to December 18, 1998 is chargeable to the People. On

---

[22]  *See* Respondent's Time Chart at 1.

[23]  *See* Pet. Mem. at 21-22.

[24]  *See id.* at 23.

[25]  *See id.*

8

September 21, 1998, defendant filed an Omnibus Motion, which the People were directed to answer two weeks later.[26] Because the People did not file their response to the Omnibus Motion until December 17, 1998,[27] the court adjourned the case to January 22, 1999, for its decision on the Omnibus Motion. Accordingly, the thirty-five day period from December 18, 1998 to January 22, 1999, previously conceded by the People,[28] is properly chargeable to the People.

On January 22, 1999, the court issued its decision on defendant's section 190.50 motion and Omnibus Motion.[29] The People, however, announced that they were not ready for trial and requested that the case be adjourned to February 21, 1999.[30] The case was adjourned to February 24, 1999 instead because petitioner's counsel indicated that he could not appear for trial on February 21, 1999.[31] Thus, of the thirty-three day period from January 22, 1999 to

---

[26] *See id.*

[27] *See* Respondent's Time Chart at 1.

[28] *See* Brief for Respondent at 45 ("By December 18, 1998, the People had not filed either the grand jury minutes or their response to the omnibus motion. The court adjourned the case to January 22, 1999, and this 35-day period was chargeable to the People.").

[29] *See* Pet. Mem. at 24.

[30] *See id.*

[31] *See id.*

9

February 24, 1999, thirty days are chargeable to the People and three days are chargeable to petitioner. Once again, at the request of the People, the case was adjourned from February 24, 1999 to March 17, 1999, and from March 17, 1999 to April 1, 1999. The corresponding twenty-one and fifteen day periods are chargeable to the People, as previously conceded.[32]

On April 1, 1999, the People were not ready to proceed to trial.[33] However, the People indicated that they could be ready by April 14, 1999, but the trial date was adjourned until April 22, 1999, at the request of defendant's counsel.[34] Of these twenty-one days, thirteen days are chargeable to the People and the remaining eight days are chargeable to petitioner.[35] The People previously conceded the thirteen day period, from April 22, 1999 to May 5, 1999, and the six day period, from May 5, 1999 to May 11, 1999, and concede these periods as chargeable to the People once again.[36] The People now also concede the one day

---

[32] *See* Brief for Respondent at 45; Respondent's Time Chart at 2.

[33] *See* Brief for Respondent at 46.

[34] *See id.*

[35] *See id.*

[36] *See id.* at 46-47.

**10**

period, from May 11, 1999 to May 12, 1999, as chargeable to the People.[37]

The forty-seven day period from May 13, 1999 to June 29, 1999 must be split between the People and petitioner. At the end of the hearing on May 13, 1999, Smith's counsel stated that he was not ready for trial but suggested May 24, 1999 as "a good date."[38] After an off-the-record discussion initiated by the People, the case was adjourned to June 29, 1999.[39] Thus, eleven days are chargeable to petitioner (May 13-24) while the remaining thirty-five days (May 24- June 29) are chargeable to the People. The sixteen day period from June 29, 1999 to July 15, 1999 must similarly be split. At the appearance on June 29, 1999, Smith's counsel declared that he was unavailable until July 2, 1999.[40] The court attempted to schedule the case for July 5, 1999, but that date did not work as the People's witness was on vacation that week.[41] The court therefore adjourned the case until July 15, 1999. Thus, the six day period, from June 29, 1999 to July 5, 1999 is chargeable to petitioner while the ten day period, from July 5, 1999 to July

---

[37] *See* Respondent's Time Chart at 2.

[38] Pet. Mem. at 25.

[39] *See id.* at 25-26.

[40] *See id.* at 26.

[41] *See id.*

11

The period from July 15, 1999 to August 10, 1999 is chargeable to petitioner as the People stated they were ready for trial but defense counsel was not ready.[42] The same holds true for the period August 10, 1999 to August 25, 1999.[43] The following periods represent adjournments associated with the reopening of the *Huntley* hearing, which was at defendant's request, and are therefore not chargeable (to either petitioner or the People): August 25, 1999 to September 9, 1999; September 9, 1999 to September 17, 1999; September 17, 1999 to September 29, 1999; and September 29, 1999 to October 1, 1999.[44]

On October 1, 1999, the court reopened the *Huntley* hearing, denied defendant's motion, and adjourned the case until October 28, 1999. This period is therefore not chargeable to either petitioner or the People. The fifteen day period from October 28, 1999 to November 12, 1999 is chargeable to the People, as conceded by respondent.[45] The period from November 12, 1999 to December 1,

---

[42] *See* Respondent's Time Chart at 3.

[43] *See id.*

[44] *See* Pet. Mem. at 27.

[45] *See* Respondent's Time Chart at 4.

1999 is not chargeable to either party, as conceded by the parties.[46] The sixteen

day period, from December 1, 1999 to December 17, 1999, was previously

conceded as chargeable to the People and remains so.[47] On December 17, 1999,

neither defendant, nor his counsel, were present in court.[48] The case was

adjourned to December 21, 1999.[49] This four day period is therefore chargeable to

petitioner. Petitioner does not seek to charge the People with any of the time

periods from December 21, 1999 through July 7, 2000.[50]

The seven days between July 7, 2000 and July 14, 2000 are

chargeable to the People as the People requested an adjournment to respond to

defendant's CPL section 30.30 motion to dismiss.[51] On July 14, 2000, the People

stated they were ready for trial but the court adjourned the case until July 25,

---

[46] *See id.*; Pet. Mem. at 19.

[47] *See* Brief for Respondent at 51.

[48] *See* Pet. Mem. at 28.

[49] *See id.*

[50] *See id.* at 20, 29.

[51] *See* Respondent's Time Chart at 5. Defense counsel filed this section 30.30 motion on May 8, 2000, *see id.*, to which the People were to respond by June 16, 2000. *See* Pet. Mem. at 29.

13

2000, for decision on defendant's section 30.30 motion.[52] This period is not chargeable to either petitioner or the People. On July 25, 2007, the court denied defendant's motion to dismiss, granted his motion for release from custody, and adjourned the case until August 7, 2000 for jury selection. This period is not chargeable.

In sum, I find that 159 days, previously conceded by the People in their appellate brief, are chargeable to the People for purposes of the instant habeas petition. In addition, I find another 174 days to be chargeable to the People, for the reasons discussed above. Thus, a total of 333 days, or approximately eleven months, is chargeable to the People for purposes of the *Barker* analysis.

## B.    Prejudice to Petitioner

The fourth *Barker* factor is prejudice to the defendant.[53] Smith was in

---

[52]    *See* Respondent's Time Chart at 5.

[53]    Judge Maas found Smith's showing of prejudice to be far from overwhelming. *See* R&R at 13-15. Although Smith claimed that his wife divorced him because of his lengthy pre-trial incarceration and that he lost his job as a shipper for the same reason, Judge Maas discounted these allegations because "Smith has not demonstrated any causal relationship between these events and the trial delays." *Id.* at 14. Judge Maas also noted that Smith offered no details in support of his "conclusory assertions" that his defense was impaired by his inability to gather exculpatory evidence and the dimming of witnesses' memories. *Id.* at 14-15. Judge Maas held that in the absence of any real showing of

14

custody for approximately two years from the date of his arrest through the commencement of his trial. During this time, he was housed primarily at Rikers Island, a prison facility operated by the New York City Department of Corrections. In addition to the demise of his marriage and his impaired ability to mount a defense, Smith complains of the following in connection with his pretrial stay at Rikers Island: lack of employment opportunity; lack of educational opportunity; limited recreational opportunities; lack of fresh air; sleep deprivation; physical assaults; concern for his safety; and the onset of medical problems. These grievances, while no doubt troubling, do not represent the kind and degree of prejudice necessary to justify vacating petitioner's conviction.

Smith argues that the two years he spent at Rikers Island was the primary factor that contributed to his divorce.[54] Prior to his arrest in 1998, petitioner had been in a relationship with a woman named Pamela Thomas since 1987. The two were married in 1993.[55] In June 2004, Thomas formally filed for divorce from petitioner.[56] Petitioner claims that his lengthy pretrial incarceration

---

prejudice, Smith cannot show that the state court's rejection of his speedy trial claim was objectively unreasonable. *See id.* at 15.

[54] *See* 5/20/08 Hearing Transcript ("TR2") at 9.

[55] *See id.* at 7.

[56] *See id.* at 8.

at Rikers Island put "a great strain in [their] relationship" primarily because of the limited visitation privileges at Rikers Island, where visits are limited to one hour and no "trailer" or conjugal visits are allowed.[57] Because of this restricted visitation policy, Smith claims that he and his wife lost their "closeness" and "togetherness."[58] Smith argues that by the time he was sent to an upstate facility, more than two years after his arrest,[59] his marriage was over due to loss of contact with his wife.

The main flaw in petitioner's argument is timing. Petitioner was incarcerated at Rikers Island from August 1998 to on or about September 2000. It is during this approximate two year period that petitioner's marriage allegedly collapsed because of inadequate visiting time. But petitioner's wife did not file for divorce until June of 2004. That means that she and petitioner remained

---

[57] *See id.* at 7, 10-11. Smith testified that at "upstate" facilities, there are eight-hour visits as well as "trailer" visits where an inmate could spend three days with his lawfully wed spouse inside of a trailer kept on prison grounds. *See id.* at 10. An "upstate" facility is a long-term facility where an inmate is housed to serve his sentence. An inmate is designated to an upstate facility by the New York State Department of Correctional Services once he has been convicted and sentenced.

[58] *Id.* at 11.

[59] Smith was arrested on July 31, 1998, arraigned on a felony complaint on August 2, 1998, and indicted on August 12, 1998. On September 25, 2000, Smith was sentenced as a persistent violent felony offender to twenty-two years to life in prison.

married for over three and one-half years while petitioner was incarcerated at an upstate facility. Accordingly, she and petitioner had the opportunity for lengthier visits for over three and one-half years, as well as the possibility of conjugal visits during this period. If petitioner and his wife truly lost the closeness they once enjoyed due to petitioner's incarceration at Rikers Island, they could have re-established their bond during petitioner's subsequent incarceration at an upstate facility.[60] The fact that Thomas filed for divorce in 2004 belies any notion of prejudice resulting from Smith's pretrial incarceration at Rikers Island. The more likely scenario is that Thomas, faced with her husband's sentence of twenty-two years to life, grew tired of being a jailbird's wife with little prospect of an eventual reunion. I therefore agree with Judge Maas' conclusion that Smith has not demonstrated a causal connection between the end of his marriage and the delays in his trial.[61]

---

[60] Of course, one could take the view that once something is lost, it is lost forever and cannot be recaptured no matter how much time passes. If this is, in fact, what occurred, then petitioner may have shown sufficient prejudice from his lengthy stay at Rikers Island. That is why this Court will issue a certificate of appealability as to petitioner's Sixth Amendment speedy trial claim.

[61] *See* R&R at 14. Judge Maas reached this conclusion without the benefit of an evidentiary hearing later held by this Court. However, despite being given the opportunity, Smith introduced no evidence that would support a different conclusion than that reached by Judge Maas.

17

Finally, Smith contends that his pretrial detention at Rikers Island impaired his ability to mount a defense. Specifically, petitioner argues that his incarceration at Rikers Island "impaired his ability to mount a defense because it deprived him of the opportunity to prepare a competent [CPL section] 30.30 motion."[62] This alleged impairment was the result of restricted access to a law library: at Rikers Island, access to the law library is limited to twice a week for fifteen to twenty minutes at a time; in upstate facilities, access to the law library is virtually unrestricted.[63]

Petitioner's impairment argument is without merit because he was represented by counsel during the entire course of his criminal proceedings. In fact, petitioner's counsel filed a CPL section 30.30 motion on his behalf, which eventually resulted in petitioner's pretrial release. Furthermore, petitioner testified that the state court judge never issued a decision on any of the pro se motions he filed.[64] Access to a law library is therefore irrelevant in light of the state court's

---

[62] Pet. Mem. at 38.

[63] *See id.*

[64] *See* TR2 at 68 ("Q. To your knowledge, did the court ever issue a decision on any of your motions? . . . A. Not a one. Q. Because your pro se motions, to your knowledge, were not answered and there was no decision by the court, did your pro se motions delay your case going to trial? A. No way did it delay. It was never responded to.").

**18**

failure to act on petitioner's pro se submissions. Those submissions could have been the model of legal clarity but they were without legal effect because the state court disregarded them. Accordingly, petitioner's ability to mount a defense was not impaired by the restrictive law library policy at Rikers Island.

## IV. CONCLUSION

In sum, the first three *Barker* factors weigh in petitioner's favor: there was an eleven-month pretrial delay, chargeable to the People, to which petitioner objected on several occasions. Balanced against these factors is the last factor, prejudice, the level of which is difficult to ascertain. Despite this inherent difficulty, the lack of significant prejudice tips the scale, albeit slightly, in respondent's favor. Accordingly, I find that petitioner's right to a speedy trial under the Sixth Amendment was not violated by the inordinate pretrial delay in petitioner's criminal case.

The remaining issue is whether to grant a certificate of appealability. For a certificate of appealability to issue, a petitioner must make a "substantial showing of the denial of a constitutional right."[65] A "substantial showing" does not require a petitioner to demonstrate that he would prevail on the merits, but merely that reasonable jurists could debate whether "the petition should have been

---

[65] 28 U.S.C. § 2253(c)(2).

**19**

resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."[66] Because reasonable jurists could disagree as to the length of and reasons for delay, as well as the level of prejudice suffered by petitioner, I find that petitioner has made the requisite showing. This Court therefore grants a certificate of appealability with respect to petitioner's Sixth Amendment speedy trial claim. The Clerk of the Court is directed to close this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
         August 5, 2008

---

[66] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). *Accord Middleton v. Attorneys Gen. of the States of New York and Pennsylvania*, 396 F.3d 207, 209 (2d Cir. 2005) (denying certificate of appealability where reasonable jurists could not debate whether the district court's dismissal of the petition was correct).

**For Petitioner:**

Jeffrey G. Pittell, Esq.
299 East Shore Road
Great Neck, NY 11023
(516) 829-2299

**For Respondent:**

Alyson J. Gill
Leilani Rodriguez
Assistant Attorneys General
120 Broadway
New York, NY 10271
(212) 416-6037/8871